UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

X----------------------------------------------------------X

Sealed

                           Plaintiffs,

    vs.                                 CIVIL ACTION

                                                 FILED *IN CAMERA* AND UNDER SEAL

Sealed

                                                 NO. 3:02cv1527 (JBA)

                        Defendants.

X----------------------------------------------------------X

## FIRST AMENDED COMPLAINT

For his first amended complaint, the Relator, alleges as follows:

### I. Nature of the Action

1.    The Relator brings this action on behalf of himself and the United States to recover treble damages and civil penalties under the False Claims Act (the "FCA") which arise out of false statements and claims made or presented by defendants to the United States in violation of the FCA, 31 U.S.C. § 3729 *et seq.*, as amended.

2.    These claims are based upon defendants' submission of false and fraudulent patient claims and hospital cost reports to agencies of the United States Department of Health and Human Services in order to obtain payments for various healthcare services during the period 1996 through 2002.

3.    Defendants Yale New Haven Hospital, Inc. ("YNHH"), Yale New Haven Hospital Health Services Corporation ("YNHHSC") and Quinnipiac Medical, P.C. ("QMPC") used and

concealed a variety of illegal arrangements to induce physicians to refer patients to YNHH facilities. Top management of YNHH, YNHHSC and QMPC participated in offering and paying kickbacks to physicians, and failed to discontinue the unlawful practices even after repeated warnings by other members of management. Management and officers of YNHH, YNHHSC and QMPC from the highest executive ranks knew that paying kickbacks to and engaging in particular types of relationships with physicians was unlawful. Nevertheless, they negotiated, authorized, reviewed, approved and/or failed to rectify the payment of kickbacks, illegal remuneration and unlawful financial relationships like those described in this Complaint.

4. YNHH, YNHHSC and QMPC in accord with established practice, paid kickbacks to physicians in return for patient referrals and engaged in financial relationships with physicians, in violation of the Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b), the Stark Statute, 42 U.S.C. § 1395nn, and then submitted or conspired to submit false and/or fraudulent claims, and false and/or fraudulent statements, to the United States to receive payments for services rendered to patients referred by those physicians.

5. Defendants offered remuneration to physicians in various forms, including but not limited to: (1) excessive payments for businesses owned by physicians; (2) medical directorship contracts that provided for payments to physicians not required to perform any duties; (3) loans offered to physicians with the understanding that no interest and/or repayment would be required; (4) absorption of practice overhead expenses by YNHH and YNHHSC; and (5) incentive compensation not based upon services personally rendered by the physician.

6. The physicians to whom defendants provided illegal remuneration and kickbacks and with whom defendants entered into illegal financial relationships referred large volumes of patients, including Medicare and Medicaid patients and beneficiaries of other government

-2-

healthcare programs to YNHH and YNHH owned facilities in violation of federal law. YNHH and QMPC, in turn, submitted claims to Medicare, Medicaid, and other government healthcare programs and obtained millions of dollars worth of payments from the United States. Under the False Claims Act, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent because defendants had no entitlement to payment for services provided on referrals from such physicians.

7. Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(2), by making or causing to be made false statements when submitting these claims for payment to Medicare and other government programs. Defendants falsely certified the claims and statements entitling them to payment were "true" and/or "correct" when in fact defendants were not entitled to payment.

8. To conceal their unlawful conduct and avoid refunding payments made on the false claims, defendants also falsely certified, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7), that the services identified in their annual cost reports and provider agreements were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report and provider agreement submitted to the government, were part of defendants' unlawful scheme to defraud Medicare and other government healthcare programs.

9. Based in whole or large part on this unlawful, fraudulent scheme, since 1996, the Yale New Haven Health Network (the "Network"), which YNHH and YNHHSC created, has grown into an extended and integrated hospital network spanning the entire breadth of the state of Connecticut.

## II. Jurisdiction

10. This court has subject matter jurisdiction to entertain this proceeding pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(b) in that the action arises under the laws of the United States of America and that the claims asserted herein are brought in the name of the United States Government. Nationwide service of process is provided under 31 U.S.C. § 3732(a).

11. This Court has personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) as each defendant transacts or has transacted business in the District of Connecticut or has committed acts proscribed by 31 U.S.C. § 3729 within the District of Connecticut. The claims subject to this complaint were transmitted from Connecticut.

## III. Venue

12. Venue is proper in the District of Connecticut pursuant to 31 U.S.C. § 3732 in that the corporate defendants have their principal place of business within the District of Connecticut and that each of the individual defendants is believed to reside within this District.

## IV. Parties

13. Relator is a citizen of the United States and a resident of Connecticut. He brings this action against YNHH, YNHHSC and QMPC on behalf of himself and the United States for violations of the FCA based on its operation and management of physician practices in Connecticut. He is a former employee of YNHHSC.

14. Defendant, YNHH is a Connecticut non-stock corporation with its principal place of business in New Haven, Connecticut. YNHH, through its executive management, was responsible for establishing YNHHSC as well as the Yale New Haven Health Network ("the Network"). At all relevant times, executive management of YNHH directed the affairs of YNHHSC. YNHH received and utilized business services rendered by YNHHSC which involved

in the recruitment of physicians into the Network and the referral of patients to YNHH by recruited physicians.

15. Defendant, YNHHSC, is a Connecticut non-stock corporation with its principal place of business in New Haven, Connecticut. YNHHSC was incorporated by officers and employees of YNHH and was managed by individuals with concurrent employment affiliations to YNHH. YNHHSC received financial and logistical support from YNHH. YNHHSC was largely responsible for developing the Network.

16. Defendant, QMPC is a Connecticut corporation which was acquired in or about 1997 by individuals affiliated with YNHH and YNHHSC. At all relevant times herein, QMPC was nominally owned by YNHH's senior vice president of medical affairs, Edwin Cadman, M.D., who also served as QMPC's president. QMPC serves and has served as the Network's out-patient physician practice. QMPC is the successor-in-interest to various medical practices purchased by YNHH and/or YNHHSC during the period 1996 through the present date. The present QMPC encompasses practices formerly headed by John Godley, M.D. and Richard Kaufman, M..D.; and, the practice formerly known as CHCPhysicians and headed by Charles Hollander, M.D. To serve patients in New Haven County, QMPC established Quinnipiac Medical of Branford, LLC and Quinnipiac Medical of Branhaven, LLC on November 3, 1999, as well as a number of d/b/a entities.

### V. The Law

**A.**     ***The False Claims Act***

17. The False Claims Act (FCA) provides, in pertinent part that:

> *(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly*

-5-

> *makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;... or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,*
>
> \* \* \*
>
> *is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....*
> *(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.*

*31 U.S.C. § 3729.*

**B.**     ***The Anti-Kickback Statute***

   *18.*     The Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See, Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

19.     The Anti-kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare, Medicaid and (as of January 1, 1997) TRICARE programs. In pertinent part, the statute states:

> *(b) Illegal remuneration*
>
> > *(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind --*
> >
> > > *(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or*
> > >
> > > *(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,*
>
> *shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.*
>
> *(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --*
>
> > *(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or*
> >
> > *(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any*

> *good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,*
>
> *shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.*

42 U.S.C. § 1320a-7b(b). Violation of this statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

C.    ***The Stark Statute***

20.    Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital. The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

21.    The Stark Statute establishes the clear rule that the government will not pay for items or services prescribed by physicians who have improper financial relationships with other providers. In enacting the statute, Congress found that improper financial relationships between physicians and entities to whom they refer patients can compromise the physicians' professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality. Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities' services than similarly situated physicians who did not have such relationships. The statute was designed

-8-

specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

22. Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. See Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

23. In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. See Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

24. As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. See 42 U.S.C. § 1395nn(h)(6).

25. In pertinent part, the Stark Statute provides:

*(a) Prohibition of certain referrals*

*(1) In general*

*Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then --*

> *(A) <u>the physician may not make a referral to the entity</u> for the furnishing of designated health*

> *services for which payment otherwise may be made under this subchapter, and*
>
> *(B) <u>the entity may not present or cause to be presented a claim under this subchapter or bill</u> to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).*

*42 U.S.C. § 1395nn (emphasis added).*

    26.    The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions.

    27.    For example, compensation paid to a referring physician serving as a consultant to a hospital will fall within an exception to the statute if the contract (1) is in writing and signed by the parties; (2) is for a term of at least a year; (3) specifies the services covered, covers all the services to be provided by the physician, and the aggregate of such services is reasonable and necessary for the legitimate business purposes of the hospital; and (4) sets the payment for contract services in advance, consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other business generated between the parties. 42 U.S.C. § 1395nn(e)(3). Thus, compensation paid to a physician (directly or indirectly) under a medical directorship that exceeds fair market value, or for which no actual services are required, triggers the referral and payment prohibitions of Stark II with respect to designated health services referred by that physician.

    28.    Violation of the statute may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of $15,000 for each service included in a claim for which the entity knew or should have known that payment should not be made under Section 1395nn(g)(1); and (b) an

assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knew or should have known was prohibited. See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

29. Regulations promulgated by HHS under its rulemaking authority expressly prohibit certain types of arrangements which may foster improper referrals and kickbacks. 42 C.F.R. § 411.357 requires that a productivity bonus component of a physician-employee's compensation arrangement be based exclusively upon services performed personally by the physician. 42 C.F.R. § 1001.952 (e), which addresses the sale of physician practices to hospitals or other entities, does not permit the selling practitioner to be in a position after completion of the transaction to influence referrals to, or otherwise generate business for the purchasing hospital or entity.

30. In sum, the Stark Statute prohibits hospitals from billing Medicare for certain designated services referred by a physician with whom the hospital has a financial relationship of any type *not* falling within specific statutory exceptions. 42 U.S.C. § 1395nn. The statute specifically prohibits hospitals from billing for such services. In-patient and out-patient hospital services and home health services are among the designated health services to which the Stark II referral and billing prohibitions apply.

### VI. The Federal Healthcare Programs

*A.     The Medicare Program*

31. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Part B covers the cost of physicians' services and other ancillary services not covered by Part A. Most hospitals

-11-

and physicians derive a substantial portion of their revenue from the Medicare Program.

32.     HHS is responsible for the administration and supervision of the Medicare Program. CMS (formerly HCFA) is an agency of HHS and is directly responsible for the administration of the Medicare Program.

**1.      The Medicare Part A Program**

33.     Under the Medicare Part A Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare Program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

34.     As detailed below, YNHH submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

35.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

36.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a HCFA Form UB-92 (and prior to 1992, on a HCFA Form UB-82).

37.     As a prerequisite to payment by Medicare, HCFA requires hospitals to submit annually a form HCFA-2552, more commonly known as the Hospital Cost Report. Cost Reports

-12-

are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

38. After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

39. YNHH was at all times relevant to this complaint, required to submit Hospital Cost Reports to its fiscal intermediaries and did in fact do so.

40. Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s/UB-82s) during the course of the fiscal year. On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Program or the amount due the provider.

41. Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by YNHH to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R.

-13-

§ 413.64(f).

42. Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

43. For cost reporting periods prior to September 30, 1994, the responsible provider official was required to certify, in pertinent part:

> to the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

Form HCFA-2552-81.

44. Thus, the provider was required to certify that the filed Hospital Cost Report is (1) <u>truthful</u>, <u>i.e.</u>, that the cost information contained in the report is true and accurate, (2) <u>correct</u>, <u>i.e.</u>, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, and (3) <u>complete</u>, <u>i.e.</u>, that the Hospital Cost Report is based upon <u>all</u> information known to the provider.

45. The "applicable instructions" contained in the pre-September 1994 certification included the requirement that services described in the cost report complied with Medicare program requirements, including the provision outlawing kickbacks, codified in 42 U.S.C. § 1320a-7b(b).

46. The pre-September 1994 Hospital Cost Report (HCFA-2552-81) reminded providers that "intentional misrepresentation or falsification of any information contained in this cost report may be punishable by fine and/or imprisonment under federal law."

47. On September 30, 1994, Medicare revised the certification provision of the Hospital Cost Report to add the following:

> I further certify that I am familiar with the laws and regulations

-14-

> regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

48. Subsequently, in or about 1996, the Hospital Cost Report was revised again to include the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

49. Under all versions of the HCFA Form 2552 certification, the provider certified that the services provided in the cost report were not infected by a kickback. Once the Stark Statute became effective, the provider certified that the services provided in the cost report were billed in compliance with the Stark Statute.

50. YNHH was familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports.

51. A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

52. Hospital Cost Reports submitted by YNHH were, at all times material to this complaint, signed by YNHH employees (including employees of its various predecessors), usually

-15-

a hospital official and, in some cases, a Corporate Reimbursement Department employee, who attested, among other things, to the certification quoted above.

53. In 1998, YNHH received approximately $160,000,000 in Medicare Part A payments from the United States government. Upon information and belief, the amount of Medicare payments received annually by YNHH during the period covered by this complaint remained in this range.

### 2. The Medicare Part B Program

54. Medicare Part B is a voluntary, supplemental medical insurance program covering out-patient services rendered to beneficiaries. 42 U.S.C. §1395j. Beneficiaries are generally citizens and lawful permanent residents over the age of 65. 42 U.S.C. §1395o.

55. The United States administers Medicare Part B through CMS (formerly HCFA) which is authorized to contract with private insurance companies, or "carriers", to administer claims submitted under Part B. Carriers are responsible for processing claims submitted by formally authorized health-care providers or physicians including making payments and reviewing claims for fraud.

56. The "invoice" for Medicare Part B services is form HCFA-1500 or its electronic equivalent. 42 C.F.R. §424.32. Claims submitted on this form must include: the provider's identification number; the patient's beneficiary number; service date; HCPCS procedure code; and, service charge. The HCPCS is derived from the CPT code system developed by the American Medical Association. Under the HCPCS system, all medical services are assigned a uniform code number consisting of 5 to 7 digits. 42 C.F.R. Part 424, Subpart C.

57. Claims submitted for Medicare Part B services on form HCFA-1500 are submitted subject to and pursuant to the certifications contained on form HCFA 855 (now form CMS 855).

(See, paragraph 76).

**B.       The Medicaid Program**

58.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

59.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396, et seq. Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

60.     In many states, provider hospitals participating in the Medicaid program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.

61.     In some states, provider hospitals participating in the Medicaid program file a copy of their Medicare cost report with the Medicaid program, which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement. In other states, provider hospitals file a separate Medicaid cost report.

62.     Providers incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports, and include data concerning the number of Medicaid patient days at a given facility.

63.     Typically, each state requiring the submission of a Medicaid cost report also requires an authorized agent of the provider to expressly certify that the information and data on the cost report is true and correct.

64. Individual Medicaid programs use the Medicaid patient data in the cost report to determine the reimbursement to which the facility is entitled. The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

65. Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

66. Where a provider submits a Medicaid cost report containing the same false or incorrect information from the Medicare cost report, false statements and false claims for reimbursement are made to Medicaid.

67. YNHH sought reimbursement from designated state Medicaid programs for the time period pertinent to this Complaint. In 1998 YNHH, received approximately $41,000,000 in Medicaid payments. Upon information and belief, the amount of Medicaid payments received by YNHH during the relevant period has remained in the range of $40,000,000 per year.

C.     **Other Federal Healthcare Programs**

68. At all times relevant to this Complaint, YNHH was enrolled in, and sought reimbursement from, various other federally funded health insurance programs including, the Federal Employees Health Benefits (FEHB) Program and the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), now known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS"). FEHB provides medical insurance benefits to certain federal employees and their families. TRICARE/CHAMPUS provides medical benefits, including hospital services, to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b)

the unmarried spouses and children of deceased service members; and (c) retirees. Hospital services at non-military facilities are sometimes provided for active duty members of the armed forces, as well. 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

69.     In addition to individual patient costs, TRICARE/CHAMPUS reimburses hospitals for two types of costs based on the Medicare cost report: capital costs and direct medical education costs. 32 C.F.R. § 199.6.

70.     A facility seeking reimbursement from TRICARE/CHAMPUS for these costs is required to submit a TRICARE/CHAMPUS form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement") in which the provider sets forth its number of TRICARE/CHAMPUS patient days and financial information which relates to these two cost areas and which is derived from the Medicare cost report for that facility.

71.     This Request for Reimbursement requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report."

72.     Upon receipt of a hospital's Request for Reimbursement and its financial data, TRICARE/CHAMPUS or its fiscal intermediary applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE/CHAMPUS patients in the facility.

73.     YNHH submitted Requests for Reimbursement to TRICARE/CHAMPUS that were based on its Medicare cost reports. Whenever YNHH Medicare cost reports contained falsely inflated or incorrect data or information from which defendants derived their Requests for Reimbursement submitted to TRICARE/CHAMPUS, those Requests for Reimbursement were

-19-

also false.

74.     Whenever YNHH's Requests for Reimbursement were false due to falsity in their Medicare cost reports, YNHH falsely certified that the information contained in their Requests for Reimbursement was "<u>accurate</u> and based upon the hospital's Medicare cost report." (emphasis added).

75.     YNHH knew that false claims contained in their Medicare cost reports often would affect TRICARE/CHAMPUS reimbursement as well.

**D.      Provider enrollment procedures**

76.     In order for a medical service provider (i.e., hospitals) or supplier (i.e., physicians) (referred collectively hereinafter as "Provider" or "Providers") to obtain payment from federally funded health insurance programs, a Provider must apply for and be properly enrolled in each federal program. For example, prior to January 1998 and as a prerequisite to enrollment in the Medicare program, a Provider was required to apply for and obtain a Medicare Provider Number. After January 1998, all Providers were required to submit form HCFA 855 in order to participate in Medicare and other federally funded health programs. Form 855 sought comprehensive information regarding a Provider as well as its relationship with related entities.[1] Additionally, a prospective Provider was required to certify to the following statements:

> *1)      I have read the contents of the application and the information contained herein is true, correct, and complete. If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare or other federal health care program contractor of this fact immediately.*
>
> *2)      I authorize the Medicare or other federal health care program contractor to verify the information contained herein. I*

---

[1] Form HCFA 855 was issued January, 1998. HCFA 855 has been periodically updated and is now referenced as form CMS 855.