> *agree to notify the Medicare or other federal health care program contractor of any changes in this form within 30 days of the effective date of the change. I understand that a change in the incorporation of my organization or my status as an individual or group biller may require a new application.*
>
> *3) I have read and understand the Penalties for Falsifying Information on the Medicare Health Care Provider/Supplier Enrollment Application, as printed in this application. I am aware that falsifying information will result in fines and/or imprisonment.*
>
> *4) I am familiar with and agree to abide by the Medicare or other federal health care program laws, regulations and program instructions that apply to my provider/supplier type. The Medicare laws, regulations and instructions are available through the Medicare Contractor. I understand that payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including the anti-kickback statute and the Stark law), and on a provider/supplier being in compliance with any applicable conditions of participation in any federal health care program. ...*
>
> *9) I will not knowingly present or cause to be presented a false or fraudulent claim for payment by the Medicare or other federal health care programs, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.*

77.   Any changes in the information contained on form HCFA 855 must be reported to Medicare or other federal health care contractor within thirty (30) days of the operative event.

78.   YNHH, QMPC and individual physician's affiliated with YNHH and QMPC were required to complete and submit Form 855 and, upon information and belief, did so.

### VII. The Defendants' Scheme to Defraud the Federal Government

**A.    Summary of Defendants' illegal conduct**

79.   Commencing in 1996, YNHH developed a business strategy by which it sought to capture a larger share of the Connecticut healthcare market. In furtherance of this strategy, it established and financed YNHHSC for the partial purpose of acquiring established medical

-21-

practices which would in turn refer patients to YNHH for inpatient and outpatient services. Under this strategy, once a patient treated with a physician affiliated with YNHH - YNHHSC, the patient would remain within this system by receiving treatment from affiliated physicians and receiving diagnostic services from affiliated laboratories. In this manner, a greater percentage of the money expended by or on behalf of a patient would remain within the YNHH - YNHHSC network. QMPC, in addition to, CHCPhysicians and the Kaufmann Medical Group were established medical practices acquired by YNHH - YNHHSC in this fashion and for these purposes.

80. Central to this strategy was obtaining the commitment of physicians to refer patients to YNHH and other YNHHSC providers for treatment. YNHH and YNHHSC utilized patient data to assist in identifying physicians with high Medicare/Medicaid billings and high patient referrals. For physicians earmarked in this manner or otherwise selected for recruitment, YNHH and YNHHSC offered such physicians remuneration in a variety of guises, including, excessive payments for medical practices owned by the physicians, improper incentive compensation, sham personal service agreements, including, medical directorship contracts, that provided for payments to physicians, and the payment of overhead expenses by YNHH and YNHHSC. Through these illegal practices, YNHH and YNHHSC were able to ensure that they would receive a high level of patient referrals from affiliated physicians. Thus, YNHH and YNHHSC were able to establish a pattern of internal referrals by purchasing established medical practices and providing employment agreements with the physicians that either owned or were directly affiliated with these practices.

81. The incentive compensation program provided to many of the physician-employees illegally compensated the physician-employees on the value and volume of referrals made by the

practice groups acquired and owned by YNHH - YNHHSC. This program had the effect of illegally compensating individual physicians for medical services not requested by or personally provided by the patient's physician.

82. For patients receiving federally funded health insurance coverage, the effect of these inducement payments or kickbacks was that a greater amount of money was paid by the Federal government for the medical service provided because each claim included an illegal self-referral component which would not have been paid had the government known of this arrangement and understood its workings.

83. Defendants, either directly or indirectly, submitted claims for medical service reimbursement to agents of the federal government on forms UB-92, HCFA-1500, HCFA-1450 and through the Electronic Data Interchange program for which they received payment and/or reimbursement from the federal government.

84. Pursuant to the certifications contained on Forms 2552 and 855, as a condition of claim submission and payment, defendants were obligated to comply with all laws, regulations and program instructions pertaining to the federal health care programs under which the claim was submitted. By submitting claims for services rendered in violation of anti-kickback and self-referral statutes and regulations, defendants violated the terms of their provider agreements and were ineligible to submit and/or receive payment for these claims.

85. During the time period relevant hereto, YNHH was aware of the prohibitions against kickbacks and the legal restrictions on financial relationships with physicians. This awareness was based on information obtained by YNHH from various sources, including its counsel, outside training programs, trade associations, and the government. Despite this information, YNHH embarked on a strategy of paying kickbacks to and engaging in unlawful

financial relationships with physicians to induce patient referrals to YNHH facilities. YNHH in turn billed for and collected millions of dollars in reimbursement from the United States based on patient referrals from these same physicians.

**B.     Details of the Defendants' scheme and unlawful conduct.**

   **1.     YNHH and YNHHSC acquisition of medical practices.**

   86.    In order to induce physicians to refer patients to YNHH and other facilities within the Network, YNHH provided the following unlawful inducements and kickbacks to physicians who were in a position to refer patients to YNHH facilities and entered into the following prohibited relationships with such physicians:

   a.     <u>Excessive payments for medical practices owned by physicians</u>. YNHH and YNHHSC utilized patient data to identify and earmark certain high producing and high referral potential physicians and physician practices for acquisition. See Paragraph 88. YNHH and YNHHSC acquired these practices by offering above market prices for the practices and above market employment contracts for practice owners and key employees.

   b.     <u>Improper incentive compensation</u>. In addition to a physician's lucrative base salary, YNHH and YNHHSC provided incentive compensation to physicians based on the productivity of the physician's former practice and the productivity of other physician-employees of the practice. Physicians referring patients to YNHH for inpatient treatment or outpatient services received credit for the referral even though the physician provided little or no direct medical care to the patient while admitted at YNHH.

c. <u>Sham personal service agreements ("PSA"), including, medical directorship contracts, that provided for payments to physicians</u>. YNHH and YNHHSC offered as a component of the practice acquisition package, key physicians with PSA for which little or no work needed to be performed. The PSA's were offered as an additional referral inducement to the physicians whose practices were being acquired.

d. <u>Overhead expenses borne by YNHH and YNHHSC.</u> As an additional inducement to join YNHH and YNHHSC, physicians selling their medical practices were assured that various overhead expenses typically borne by practice groups would be absorbed by YNHH and YNHHSC and not debited against the practice group's gross revenues. The direct effect of this practice was that physician compensation was not effected by the cost of conducting business.

<u>Excessive payments for medical practices owned by physicians.</u>

87. In 1996 and 1997, YNHHSC vice president Tucker Leary, acting on instructions from YNHH president and chief executive officer, Joseph Zaccagnino, acquired QMPC, CHCP and the Kaufman Medical Group for YNHH and YNHHSC. In January, 1997, he explained to other members of management that the acquisitions will help the organization attain its goal which was to increase referrals to YNHH from physicians.

88. While the specific terms of these deals are known only to Zaccagnino, Leary, former chief financial officer Bart Price, the principals and the lawyers involved in the transactions, it was generally known that the selling doctors had realized very significant profits for the sale of their interests. In fact, even the selling doctors had bragged that they had obtained a

-25-

great price for their practices. On January 30, 1997, Godley remarked when questioned about the deal that he had "really put it to YNHH".

89. Aside from the personal service aspects of the contracts, as discussed below, Relator understood that the selling physicians had received prices far in excess of accepted valuation methodologies. This opinion was shared by several members of upper management, namely Price and David Wurcel, head of billing, who openly opposed the acquisitions on the presented terms.

90. Price and Wurcel's principle concern was that the deals did not make economic sense. They, however, failed to consider the value of the referrals that these doctors would be expected to make to YNHH and which was an integral component of the purchase and sale arrangements. This key factor was included by Leary and Zaccagnino in their calculations and justified the acquisitions. It was understood that the reason YNHH had paid over market prices for these practices was to "lock in" the selling physicians as referral sources to YNHH.

91. At a meeting on January 8, 1998, the concern among some members of management over excessive purchase prices for physician practices and incentive compensation was so intense that participants joked about wearing orange jump suits, an allusion to federal prisoner apparel.

92. Concerned about these acquisition practices, in May, 1997, Relator and Steven Merz, a mid-level manager, started a review of the medical practice acquisitions. After repeated attempts to obtain access to the actual purchase and sale contracts, Relator and Merz were reassigned to other duties. They were ultimately unable to obtain copies of the documents from any source.

Improper incentive compensation.

-26-

93.  The physicians who sold their practices to YNHH - YNHHSC were offered lucrative employment packages as a component of the sale. On February 12, 1997, John Godley remarked that they [the QMPC physicians] got paid for what they do not do in clinical practice. He explained that he and the other doctors received financial credit for the hospital admission of patients that were seen by other physicians. Additionally, he stated that he and the other QMPC physicians received incentive compensation based upon the value of outpatient medical services performed by other physicians as opposed to the services personally performed by Godley or the other physicians. Relator understood that this arrangement was a common component of the employment agreements executed by YNHH and the other physicians who sold their medical practices to YNHH.

94.  The practice of paying incentives to someone other than the physician performing the service is prohibited by 42 C.F.R. § 411.357. This regulation requires that a productivity bonus component of a physician-employee's compensation plan be based upon services performed personally by the physician.

95.  The effect of these incentive arrangements was an upward shift in the value of outpatient billing with a greater emphasis being placed on the ordering of higher value, higher physician labor component services.

96.  Although Relator does not know the actual value of the incentive compensation paid to these physicians, at various times during 1997 Price and Wurcel complained bitterly to management that the deals, including the incentive components, did not make economic sense. YNHHSC lost approximately $7 million dollars in 1997 and $6 million in 1998.

97. Despite these criticisms and losses, the practice of paying incentive compensation as outlined above continued but with an emphasis being placed on finding a way to get physicians to generate greater fees while at the same time attempting to lower incentive compensation.

<u>Sham personal service agreements, including, medical directorship contracts, that provided for payments to physicians.</u>

98. On February 12 and June 19, 1997, Godley also discussed medical directorships that were created at QMPC and CHCP as a component of the sales of the medical practices. Under these arrangements, physicians in each office were appointed a medical director for a specific area, which in Godley's case was the laboratory. Each physician would then receive additional compensation from YNHH for the services purportedly being performed. In reality, each physician receiving a medical directorship performed few if any services while receiving compensation.

99. The exact value, nature and to whom these arrangements were offered is not known given that all documentation on this point is in the possession of defendants and their counsel. What is known is that medical directorships were created for the physicians selling their interests in medical practices, that no need existed for these medical directorships and that they were created as yet another means to ensure that patient referrals to YNHH would be ongoing.

<u>Overhead expenses borne by YNHH and YNHHSC.</u>

100. Under the employment and incentive compensation agreements entered into by the selling physicians and YNHH, the selling physicians received their compensation and incentives without any offsets or adjustments for the cost of overhead services borne by QMPC. Although following the acquisition of the various medical groups, QMPC became a stand alone medical practice providing out-patient medical services, YNHH and YNHHSC provided billing and purchasing services at no charge to QMPC.

-28-

101. The effect of this practice and policy was that the selling physicians received guaranteed payments regardless of the practice's actual profit or loss status. This arrangement provided yet another inducement for physicians to refer patients to YNHH.

102. Wurcel, the director of billing, was concerned that YNHH's rendering of such services to QMPC created a problem because YNHH included the cost of all services rendered as a component of its cost report submission to HCFA. YNHH did not break out or deduct the costs associated with services rendered to outpatient service providers. Wurcel was especially concerned that a government audit would reveal this state of affairs.

### 2. YNHH's affiliation with Greenwich Hospital.

103. In 1998, YNHH and YNHHSC entered into an affiliation with Greenwich Hospital whereby Greenwich Hospital became a part of the Network. YNHH and/or YNHHSC paid Greenwich Hospital several millions of dollars to have this affiliation and promised additional funding up to $10 million to provide for physician linkages to YNHH. Patient billing for Greenwich Hospital was undertaken by YNHH and YNHHSC. Prior to and following this affiliation, YNHH and YNHHSC became aware of certain business practices engaged in by Greenwich Hospital which had the effect of causing patient referrals to YNHH and which included the following:

    a. <u>Sham loans offered to physicians with the understanding that no interest and/or repayment would be required</u>. YNHHSC affiliate, Greenwich Hospital, provided approximately $600,000 to each of approximately five physicians, whom Greenwich Hospital sought to have in its practice locale. These payments were made to the physicians with the understanding that the loans would not need to be to repaid. The loans were made with the expectation and understanding that the

-29-

physicians would refer patients to Greenwich Hospital and later to YNHH. After Greenwich Hospital became an affiliate of YNHHSC, YNHH and/or YNHHSC performed billing services for Greenwich Hospital which included billing for patients referred by physician's receiving these sham loans.

    b.    <u>Preferential lease and practice benefits</u>. Greenwich Hospital offered physicians sub-market rates on office space and practice benefits such as equipment and use of Greenwich Hospital employee services. YNHH and YNHHSC were aware of these practices when they affiliated with Greenwich Hospital and performed billing services for Greenwich Hospital which included billing for patients referred by physician's receiving these preferential leases and services.

    c.    <u>Physician recruitment services</u>. Greenwich Hospital provided at no cost recruitment services to private physician practices owned by physicians with privileges at Greenwich Hospital. These services were provided and received with the understanding that the physician would provide referrals to Greenwich Hospital. This practice continued after the affiliation of YNHH and Greenwich Hospital and with the knowledge of YNHH and YNHHSC executive management. The effect of this practice was that physicians were recruited with the understanding that they would refer patients within the Network.

C.    False Claims Resulting from Violations of the Anti-Kickback Act and the Stark Amendments.

    104.    Pursuant to the scheme, pattern and practice described above, YNHH provided illegal remuneration, inducements and kickbacks to many physicians, submitted claims which were false and fraudulent, and fraudulently obtained payments from the United States on referrals by

-30-

these physicians. These actions constituted violations of the Stark Statute, the Anti-kickback statute and the False Claims Act. Had the Government been aware of the falsity of the claims, the true reason that claims were being submitted and the statutes violated by the underlying actions, these claims would not have been paid.

105.    Through the practices outlined above, YNHH's and YNHHSC's executive management established a corporate climate that tolerated and encouraged illegal remuneration as one way to insure the success of the Network. Based on the pattern and practice of kickbacks, illegal remuneration and prohibited relationships between YNHH, QMPC and numerous physicians, combined with the participation of YNHH and YNHHSC management in this conduct, the Relator alleges, on information and belief, that additional violations of the Anti-kickback Statute, Stark Statute and/or the FCA likely occurred. At such time as these additional violations become known, the Relator will seek leave to amend this Complaint accordingly.

## XI. Damages

106.    The acts of defendants in submitting, causing to be submitted, or conspiring to submit false claims, statements and records, specifically, Forms HCFA 1500, HCFA 2552, HCFA 855, CMS 855, UB-82 and UB-92 for the period 1996 through 2002 damaged the United States because it paid YNHH and QMPC for items and services for which they were not entitled to reimbursement.

107.    Defendants profited unlawfully from the payment of illegal remuneration and kickbacks to physicians.

## Count One

108.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 107 of this Complaint.

-31-

109. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729-32, as amended.

110. Through the acts described above, defendants and their agents and employees knowingly presented and caused to be presented to the United States Government, false and fraudulent claims, records, and statements in order to obtain reimbursement for health care services provided under federally funded health insurance programs.

111. Through the acts described above and otherwise, defendants and their agents and employees knowingly made, used and caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States Government.

112. Through the acts described above and otherwise, defendants and their agents and employees knowingly made, used, and caused to be made or used false records and statements to conceal, avoid, and/or decrease defendants' obligation to repay money to the United States Government that defendants improperly and/or fraudulently received. Defendants also failed to disclose to the Government material facts that would have resulted in substantial repayments by them to the federal government.

113. The United States and its fiscal intermediaries, unaware of the falsity of the records, statements, and claims made or submitted by defendants - or their failure to disclose material facts which would have reduced government obligations - have not recovered federal health insurance program funds that would have been recovered otherwise.

114. By reason of the defendants' false records, statements, claims, and omissions, the United States has been damaged.

-32-

Count Two

115.   Relator realleges and incorporates by reference the allegations made in Paragraphs 114 of this Complaint.

116.   This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. § 3729-32, as amended.

117.   Through the acts described above and otherwise, defendants entered into a conspiracy or conspiracies among themselves and with others to defraud the United States by getting false and fraudulent claims allowed or paid. Defendants have also conspired to omit or to actively conceal facts which, if known, would have reduced government obligations to them or resulted in repayments from them to government programs. Defendants have taken substantial steps in furtherance of those conspiracies, inter alia, by preparing false claims for reimbursement and other records, by submitting such records to the Government for payment or approval, and by directing their agents, consultants, and personnel not to disclose and/or to conceal defendants' fraudulent practices.

118.   The United States and its fiscal intermediaries, unaware of defendants' conspiracies or the falsity of the records, statements, and claims made or submitted by defendants and their agents, employees and co-conspirators, and as a result thereof, have paid and continue to pay substantial amounts of money in federal health insurance program reimbursements that they would not have paid. Furthermore, because of the false records, statements, claims and omissions by defendants and their agents, employees and co-conspirators, the United States, its fiscal intermediaries have not recovered federal health insurance program funds from the defendants that otherwise would have been recovered.

119. By reason of defendants' conspiracies and the acts taken in furtherance thereof, the United States has been damaged.

WHEREFORE, Relator prays for judgment against defendants as follows:

1. That defendants cease and desist from violating 31 U.S.C. § 3729 *et seq;*

2. That the court enter judgment against defendants in an amount equal to three times the amount of damages sustained by the United States as a result of the defendants actions, as well as a civil penalty against each defendant of $11,000 for each violation of 31 U.S.C. § 3729;

3. That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal Civil False Claims Act;

4. That Relator be awarded all costs and expenses of this action, including attorneys' fees, and;

5. That the United States and Relator receive all such other relief as the Court deems just and proper.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

January 10, 2003

Philip Russell, P.C.

By: _____
Harold R. Burke
Attorneys for the Relator
71 Lewis Street
Greenwich, Connecticut 06830
tele: (203) 661-4200
fax: (203) 661-3666
e-mail: hrburke@aol.com
Fed. Bar No. CT 03332